Case No. 25-1733, Global Voice Group SA, Appellants. This is Republic of Guinea. Mr. Loomis for the Appellants. Mr. Boykin for the Appellate. Mr. Lewis, good morning. Good morning, Your Honor, and may it please the Court. Alex Loomis for Appellant Global Voice Group. I'm joined today by a representative from Global Voice Group, Mr. Fernando Avras. With the Court's leave, I'd like to reserve two minutes for rebuttal. There's multiple grounds for reversal that are laid out in our briefs, but I want to focus on the one that I think follows most plainly from this Court's precedent, which is that the District Court failed to apply this Court's decision in TIG. On page 560 of the joint appendix, the District Court ruled that the relevant inquiry and the relevant point we had to prove was that Guinea was a party to the arbitration agreement. That is wrong under TIG, which rejected this original party's only reading of the FSIA's arbitration exception. Instead, TIG held that it's possible to hold foreign states liable under the FSIA based on traditional third-party theories by which third parties can be bound under two arbitration agreements. Like successorship. Like successorship. Which is not present here. True, but TIG also mentioned third-party beneficiaries. I'm sorry, Judge Cassis. No, I just – so what's the – what's the error? So the error is that the Court ruled that we had to show that they were an original party, and we – I mean, that's what I'm stumbling over. Original – in TIG, that makes sense. Original party as opposed to successor. So – I'm going to focus on original. So in – Here, it's made the contract versus what? Made the contract because they were a third-party beneficiary. And in TIG, it wasn't just that you're an original party or you're a later party. Instead, TIG cited the full passage from Arthur Anderson that laid out all the different theories by which a third party could be bound, including alter ego, including third-party beneficiaries, including estoppel. That alone is right there, is ground to vacate, in my view. The district court said that you all didn't adequately explain why involvement and – the involvement and benefit of the sovereign itself made a difference. No, so we – Isn't that just a shorthand rejection of third-party beneficiary theory? No, I don't think so because here we actually had a controlling decision from the Paris Court of Appeal that said we were a beneficiary under the applicable law there. And the district court simply declined to consider that and said it failed to see why French law would apply despite the fact that we had argued throughout that French law should apply because it is the primary jurisdiction here. And I'd point out – I realize more could be done. That's always the case when you're up on appeal. But we actually did more than the plaintiffs did in TIG. And if I would commend this court to go back and listen to the oral argument in TIG minutes 10 to 13, where Judge Walker actually specifically proposed to the plaintiffs that they might lose for this very reason. That he said that nobody had briefed the choice of law question in TIG, and therefore couldn't he just rule that plaintiffs lost because they failed to meet their initial burden of production? And that's not the approach this court took. Instead, it remanded. Now, we did actually a lot more in the district court, and we've certainly done a lot more on appeal on this issue. We specifically called to the court's attention that French law should govern here, and that is enough to preserve a choice of law issue. But moreover, once we put French law before the district court, the district court did not conduct its own choice of law analysis and say I don't think French law should not apply. And in fact, there was no showing by Guinea below or by the district court in its opinion that Guinea would not be bound as a third-party beneficiary under any applicable law. The choice of law – Your primary framing is to raise that issue through the French court judgment, which sounds to me more like a Hilton preclusion question than a TIG question. So let's just disentangle them a little bit. So put preclusion to this. There's a preclusion argument here. It's tricky, but if you win on that, we're done. Okay. But just forgetting about preclusion, walk me through how the district court should have analyzed the beneficiary question with the substantive component and the choice of law component. Of course. So the step one under TIG is figuring out what choice of law applies, although I would respectfully submit if we went under all –  Yes, maybe. You either pick the law or you show that you win. Under every single one. So at least for the French law point, what the analysis looks like is when analyzing foreign law, it's a question of law that this court reviews de novo, that the district court has to review de novo, not through factual submissions or anything like that. That's what Rule 44.1 says. And what we pointed out is that the best evidence of what a foreign law would hold is how a foreign court of appeals has applied the law, applied its own law to the very parties in the very disputed hand. And, again, I want to emphasize this point as well. Guinea has not disputed that they are bound under French law. That is undisputed for purposes of this appeal. So we haven't developed it at this point further because we think it's self-evident from the court of appeals' decision, but also because it's undisputed and, therefore, we think we've met our burden of production and they have not met their burden of persuasion on this point. Now, I can talk further about – I think this court doesn't need to make the TIG decision right now because Guinea has actually not disputed that they would qualify as a third-party beneficiary under Ghanaian law or federal common law would be, I guess, the third substantive option one could choose. So that would be a reason for simple reversal. I've already laid out one reason for végateur based on failure to apply TIG. I would – putting aside the forfeiture, why would French law apply? This is a contract for the provision of services to the Ghanaian government entities in Guinea for the benefit of the Guinea population, and the contract expressly says Guinean law applies. Well, if I can disentangle that first and take the choice of law clause first, I think Guinea is trying to have it both ways here. They're saying that they are not a party to the entire agreement as a whole, including Article 17, which includes the arbitration agreement. Article 17 also includes the choice of law clause. If Guinea and the parties are both bound by Article 17, we win because the arbitration clause applies here and we win under delegation. But if, by contrast, they're saying that they're not bound at all by Article 17, they can't rely on the choice of law clause there. And I think that's consistent with how other circuits have addressed the scenario when there's been a real question about whether or not both parties have agreed to a choice of law clause. As to why French law would apply specifically, we respectfully submit that this is the regime that is contemplated and set up by the New York Convention, and I'm happy to elaborate on that point for most of the rest of this argument. The New York Convention creates this dichotomy between primary jurisdictions where the arbitral award was issued, the seat of the arbitration, and secondary jurisdictions, all the other jurisdictions around the world. The primary jurisdiction is king, so to speak. If a primary jurisdiction were to set aside the arbitral award, it is a decision that this court would almost always respect, absent extraordinary circumstances under this court's precedent. So why wouldn't it be federal common law? We're interpreting the meaning of made in a federal statute about our jurisdiction and seems to have distinctly federal interests in uniformity and predictability, at least in terms of U.S. courts. Why isn't that the right choice? Well, so just to be clear, Your Honor, if I might, to make a slight complicating point, technically, it is a federal common law choice of law inquiry because you're interpreting a federal statute. But our point is that, like in SEMTEC, the rule of decision you should apply is French law. As to why it shouldn't be the federal common law choice, we think it actually undermines the interest in uniformity here if you were to apply federal common law regime. Because when you're thinking about what uniformity you're trying to create here, it's not uniformity within the United States on its own. It's uniformity worldwide. And the concern that we have here is that you already have a French court, the primary jurisdiction, has considered and rejected the very argument that Guinea is not bound by here. You're running low on time. Let me ask you about a different argument. You made it briefly, but you did make an argument on page 50 of your brief. So the PTRA should be regarded as a subdivision of Guinea and thus part of Guinea itself. Yes. And I don't see a response to that, but I wonder if you want to briefly expand on that argument. I'd be happy to. That was how I was planning on closing. So under this court's Trans-Sierra decision, this court distinguished between an agency and instrumentality of a foreign state versus a political subdivision. And this wasn't this court's own common lawmaking. This was actually urged by the United States in an amicus brief submitted at the time. And the court held that an agency or instrumentality under the FSIA is considered a separate legal person. But you look to U.S. common law principles to determine whether they're a separate legal person, not the law of the foreign state itself. And the way you determine whether or not they're a separate person is by asking whether or not they primarily engage in commercial conduct or not. And the answer to that is simple, is that the core conduct of the PTRA here is regulatory. Its literal name is Postal and Telecommunications Regulatory Authority. And it supervises licenses and regulates telecoms and helps the government collect tax revenue. And so it is the same as Guinea itself. And that is a point that Guinea has not disputed in this. And it also provides a more compelling reason and explanation for why there is a signature of the minister of telecommunications here. The district court in Guinea have suggested that that signature just reflects the fact that they were providing a routine sign-off. That explanation makes no sense. Why would they need to sign the contract? The more plausible explanation is the reason they signed is because it's Guinea itself. And I see that I've run out of time, Your Honor, and I'm happy to answer any further questions or reserve the rest for a follow-up. I want to follow up on that because that struck me as well. TransAero, I think, gets you the proposition that the agency here is a political subdivision of a foreign state rather than an agency or instrumentality in the FSIA terminology. But that seems to me different from the question whether the acts of a political subdivision can be attributed to the entire state. And TransAero doesn't address that question. I looked at it a little bit. We found Wyoke in the Fourth Circuit, which comes out your way.  But it's a pretty major proposition, and it's not briefed in any great detail, and it seems like this would be hugely consequential. So I think it is actually established by the precedent. There's also a 2003 case from this court involving Iran, the name of which escapes me right now. But it's 2003 involving Iran that dealt with a terrorism exception for purposes of the plateau amendment to the FSIA. It's not exactly Bono IV, but it involves the same 1605 attribution angle. Wyoke is also another one, as Your Honor noted. GARB is also another one. GARB doesn't quite deal with the attribution problem out of the Second Circuit, but it holds that a political – that the – I think the armed forces of Poland was considered Poland itself for purposes of the takings exception of the FSIA, which is ultimately the same inquiry. Yes, it doesn't get to the attribution point, but it gets to who is the state for purposes of the 1605 exceptions. And finally, if I know that I'm over time, but if I might, I actually don't think that it's such a radical proposition. The notion that states are liable for the actions of their subdivisions is recognized in the Federalist Papers. It's something that is intrinsic to international law, and it's the reason why I think the U.S. adopted the position that it did in the amicus brief. And I think it also follows directly because Trans-Sierra wasn't just about the service question. It was about the identity of the state, 1603B specifically. And if we're defining who the state is, I think you're defining who the state is for the purposes of all the FSIA exceptions. Yeah, I'm not sure the text gets you there. I can read it your way, but I can also read it as saying the political subdivision is the political subdivision. Treat it as if it's the state. So you bring the claim against the Guinean version of the FCC, like you can sue that entity and it's treated as the state. Just a different proposition from whether a foreign state, you can glom that into the foreign state and make it one and the same entity. I think that the multiple courts' decisions interpreting Trans-Sierra emphasized that when you were suing a subdivision, you were suing the state itself. They use that verbal formulation, but it's usually in the context of answering whether it's a subdivision or an agency. And the state defendant wants to be the state. But if I might, I think that it also follows actually from the logic of the 1608 jurisprudence that Trans-Sierra was getting to. The whole premise of Trans-Sierra, the question is who are you supposed to serve when you're suing this entity? And the Trans-Sierra rule is that you should be going to the central government authorities. You shouldn't be going to the subdivision because it's a recognition that they are all the same and they are all responsible. I take your point, Your Honor, that perhaps this court has never gone quite this far in this context in so holding. But I think it is the best possible reading from these arguments, and I think that it is supported by all other circuits and all other courts to consider the issue. Just one last point just to test the intuition. I was trying to think of analogies. And does it seem plausible if a party were to get in the United States, get an injunction against the Federal Communications Commission, right, which runs telecom, that that would bind the Secretary of Defense? Well, so normally – not to fight the hypothetical. The FCC is the United States. It's one entity. Well, not to fight the hypothetical. It includes all the components that do sovereign stuff as opposed to commercial stuff, so there you go. No, no, I'm not fighting the premise. I'm fighting the hypothetical a little bit just because I would think under ex parte young standards you'd have to sue the official in charge of the FCC. But if I might, which I think does ultimately bite the bullet on this hypo. In the U.S. amicus brief that was filed in TransAero, they say that under – if you were to consider legal personhood separate, the ability to enter into contracts on behalf of a government department as illustrating that you are a separate legal person and distinct from the state. The State Department's brief says, well, if that were true, then the Defense Department and the State Department and the Commerce Department would all be separate legal persons from the government, even though obviously a contract that is signed by the Defense Department would bind the United States. Now, I might – Sorry, which brief is that? I think it's that TransAero. I believe they cite – they discussed that at the U.S. brief. I'm pretty sure that's in TransAero. I looked for a CVSG in WYOC or anything, the position of the United States on this attribution point, and I couldn't find anything. I'm not sure if there was one in WYOC on that particular issue. Again, I'm reciting what TransAero – my memory of what TransAero said about the amicus brief. Thank you. All right. We'll give you a couple minutes to reply. Thank you so much. Mr. Boykin. Apologies. I'm going to bring a bunch of writers. Good morning. May it please the Court. I want to start with the judge's – the argument that the judge did not apply French law, and then I'm going to get to whether French law should apply. But in JA562 – this is from the district court decision – the court wrote, GVG does not explain how Guinea's involvement in or benefit from the partnership agreement bears on whether Guinea agreed to arbitrate under the contract, particularly when the arbitration agreement applies by its text only to the partnership agreement's parties, defined as GVG and the PTRA. Instead, GVG points to those tribunals' decisions as if they speak for themselves, yet notably, both decisions appear to rest their findings of Guinea's consent on general principles of French contract law. GVG provides no authority establishing that those principles of French contract law govern this court's analysis. So Global Voice did not provide the court with the connective tissue to explain why French law should govern. Who chose French law? Well, that was the court of arbitration of the ICC. In the terms of reference, JA395, paragraph 21 of the terms of reference, and JA424, paragraph 151. It was not a choice made by the Republic. Why is that important? This court has said that – in next era – that when we're applying the arbitration exception to sovereign immunity, there must be some indication of consent. And the court of arbitration of the ICC's choice to seat the arbitration in Paris made French arbitral law govern that process. But the application of arbitral procedural law is not the same thing as what substantive law governs the construction of the contract, and that is governed by Guinean law. So there's no indication that Guinea ever made any choice or made any act that would invoke French law. But nevertheless, the district court gained the benefit, looked at their evidence, and said, you haven't connected the dots. What do we know, if anything, about whether Guinean law recognizes this principle that the French courts found under French law? The third-party beneficiary theory? I know nothing. And they criticize us for that. What burden is it? Is there a burden because under 28 U.S.C. 1604, the presumption is the sovereign is immune unless they make out one of the exceptions under 1605. They bear a burden of production, which usually connotes something threshold and limited. That's correct. They come in and cite the general principle of beneficiary law. They cite French law, which is not a crazy choice. Well, on appeal, they did. And before the court, they simply referred to the agreement as if it naturally spoke for itself in Bound Guinea. And we pointed out, well, if you actually look at the text and the definition of parties, Guinea's not a party. And then they came back and said, oh, wait a minute, Judge. These are not the droids you're looking for. You just have to accept what the arbitral tribunal found as who's a party. You've got to go outside the four corners. And because the arbitral tribunal found that Guinea was a party, it became a party through its conduct, and that was affirmed by the Court of Appeals, you just have to accept that. But that does not – that's not indicative of Guinea's consent to arbitrate. And if we apply the TIG framework, I think Macaulay referred to it as TIG. I'm going to just – that is what – that case is what controls what it means to make an agreement to arbitrate. And the court held an agreement is made by a sovereign if it binds that sovereign to arbitrate with the party opposing the sovereign's sovereign immunity. The question is answered by resort to ordinary principles of contract law, which may include successorship and assumption if the governing law recognizes them. And it says the word agreement, as it appears in the arbitration exception, is best understood as an act that has the legal consequences for requiring the sovereign to arbitrate. And that's what's fundamentally missing from the evidentiary record is an act by Guinea through which it consented to arbitrate with global voice. They say the test – TIG says the test is whether the sovereign is legally bound. They say French law establishes this beneficiary principle, and French law applies. That would seem to be a prima facie case unless and until you come in and either say, A, French law is not as they say, or B, French law does not apply. Okay. Let me go back to the point. There's no evidence in the record Guinea ever chose French law. But let's assume French law applies, and there is this third-party beneficiary theory. What is the benefit that Guinea derived? If you deposit a third-party beneficiary, it's all through their appellant's brief, page 1. It allowed Guinea to collect hundreds of millions of dollars of taxes, page 5. Enable Guinea to view and tax all international telecommunications traffic, page 10. Enable Guinea to collect $212 million in tax revenue. I can go on with more references. But the benefit was Guinea was going to tax. So it would essentially – the exception would swallow the rule, the arbitration exception, if every time the sovereign state in its supervisory capacity over a contract between a commercial entity and an agency of the state hoped to derive tax benefits from that contract and was therefore then bound to an arbitration agreement where there's no evidence of its consent other than the fact that it hoped to get taxes. So any sovereign state, under their theory, selecting taxes from a commercial contract with a legal person created by the state to administer telecommunications, just because Guinea wanted to get taxed money from that, that's going to – that's not giving us the requisite level of intent to be bound by the arbitration clause. And there is a First Circuit case, Morales-Posada v. Cultural Care, Inc., 141 F.4.301.314.315, where the court says, the relevant question in determining whether a non-signatory or non-party can enforce an arbitration agreement under a third-party beneficiary theory is whether the signatory is intended to confer on that third-party arbitration rights, not just any right under the contract. But back to the main point. You pick Guinean law, you pick French law. If they have a third-party beneficiary theory, the relevant law that applies to Guinea's immunity before this court is the Foreign Sovereign Immunities Act, Section 1605A6, and the arbitration exception. Did they make an agreement? They didn't. They weren't a party at the beginning. Did they do something subsequently to become a party? Well, their answer is, yeah, they were a third-party beneficiary. But the benefit that they point to throughout their brief is the collection of taxes. That cannot be – that's too passive. TIG tells us there has to be an act, but the collection of taxes is not such an act that would – from which one could confer an intent or consent to be bound to arbitrate. I just want to add. I was just going to shift over to the other theory. Is that where you're going? Yes. How about it? Well, I understand it wasn't a focus of the briefing, but are you familiar with this Trans-Ero line of cases, and do you have a reason why it and Rader, the case that says the Iranian Treasury Ministry is simply Iran, why the logic of those cases wouldn't apply here? I'm not familiar with the line of question or the line of cases. This is the argument made at page 50 of the blue brief, which intrigued at least two of us, and I agree with Judge Garcia. I didn't see any answer to it in the red brief. Page 50. The site to a Fourth Circuit case called Why Oak, and it supports the theory that Petra is Guinea for FSIC purposes.  Just one and the same. Well, just look at the arbitral ward to see what it is. I mean, they want the court to take factual findings. The arbitral ward didn't find that it was one and the same as the state. I think that's – I'll give a separate – No, but we could, applying the FSIA. If the Why Oak decision is right, you lose under the FSIA, under that theory. Well, you know, they didn't raise this before the district court, but the district court did ask a question at oral argument, and that question was, why didn't you bring this against the Petra? They did not say, oh, they're one and the same. They said the Petra has no assets here. That reference is JA 500, Mr. Draper, the postal authority, which is a party who we are not suing here because they have no assets. So if you're going to find them one and the same and there's no assets here, it's just a good reason to dismiss the case. They're suing Guinea on the theory that the actions of the Petra are the actions of Guinea because a political subdivision is the foreign state. The principles of attribution under international law, I'm not sure they really find application under the FSIA necessarily. And it cannot be the case that the state, when it creates a separate legal entity, and remember, the head of it in the contract, he was called an executive director or a managing director. He wasn't a minister. They created a sort of quasi-corporate entity with state functions to enable telecommunications. So I'm disagreeing with the factual premise that it is the state. But that wasn't briefed before the district court. Now let's see how you can say that the district court erred. Is there some reason you're – so their characterization is essentially that Petra is the Guinean FCC. Is there some way in which that characterization is inaccurate? It regulates the telecommunications industry. It grants spectrum licenses. The partnership agreement refers to it as the state regulator of the telecommunications industry. Some of the other points you're making might still apply, but that's the question. Based on the record, are you aware of a reason that it is unfair to characterize this as unfair? I would say the record doesn't support it. You could look at the arbitration award. In that the award does not say that Petra and Guinea are one and the same. That's right. And it describes it as a separate legal person. And I think the terms of reference also give a description of what it is. Oh, yeah, 117 terms of reference. This is obviously the Guinea's position, but it's in the terms of reference. It is also completely inaccurate to assert that the ARPT, that's the French version of the acronym P-T-R-A, is an emanation of the Guinean state. Indeed, in accordance with the aforementioned Article 24 of Law X, Exhibit 32, quote, the regulatory authority is an independent legal person governed by public law, endowed with financial and management autonomy, governed by the special status defined by this law and placed under the supervision of the minister in charge of telecommunications, end quote. That was Exhibit C-32 before the arbitral tribunal. It's referenced in the terms of reference. That was not really an issue in the arbitration. The arbitral tribunal treated it for what it was, a separate legal person governed by public law, but nevertheless found that Guinea was bound because of Guinea's involvement in the contract. The arbitral award treats them as distinct. They don't treat them as one and the same. All right. Mr. Boykin, your time is up, so thank you. Okay. I was just going to try to give you one more reference to, yes, Paragraph 2 of the Arbitral Award JA-32, where the arbitral tribunal defines who the parties are, PQRA, and maybe that will be of some assistance to resolving that question. Thank you for indulging me going over time. All right. Mr. Loomis, why don't you take two minutes? Just a few quick points, Your Honor. First off, on the same legal person, yes, the arbitral award said that they were separate legal persons, but the arbitral award was not applying transaero, which is what this court would have to apply, and Mr. Boykin did not dispute that they would qualify as a subdivision under the transaero test. Second, on the TIG question as a whole, if we decide to reach that, there's also no dispute for Mr. Boykin that under their theory of the way the burdens of proof should work under this TIG inquiry, the plaintiffs should have lost in TIG, and that that TIG should have resulted in an affirmance for Argentina rather than a vacatur and remand. On the next point on TIG, they say that the only record evidence here is that the state was passively receiving tax income. That is absolutely not true, and we cite this in our brief. Guinea also implemented ministerial decrees, which are cited by both the French court and the arbitral award to effectuate and fulfill the PTRA's obligations under this. Guinea was also the entity that caused PTRA to break the agreement. If Guinea can break the agreement, then Guinea can arbitrate under the agreement. Guinea also broke off settlement negotiations over the agreement. These are all factors that would undisputedly qualify them as a third-party beneficiary under U.S. common law, and we cite the Cargill case, and they never actually disputed this point until just now when they cited an inapposite First Circuit case that did not even specify what choice of law it was applying, and I know that because I was counsel of record there. The third point on TIG insurance is they say that Guinea never selected French choice of law at all, but to be clear here, we're agreeing that there is no specific agreement about what law is going to govern the arbitral agreement formation question. That's common ground for both sides. But when you do a choice of law inquiry, that's when there isn't an agreement to start with, and it's our point that the New York Convention forces you to look to the primary jurisdiction above all. The Gary Born Treatise and the Balkan Energy case get into this for more detail, but it's both due to the primary role of the primary jurisdiction, and if I could just finish this sentence, Judge Henderson, if you'll indulge me. It's also because in Article 5.1a, as the Gary Born Treatise and the Balkan Energy case and the Vandenberg Treatise all explain, Article 5.1a of the New York Convention says that questions about the existence or the validity of arbitration agreements are decided by default under the rules of the primary jurisdiction unless there is a specific agreement by the parties otherwise. Guinea signed the New York Convention. So did the United States. There is consent, and it certainly is the better rule that promotes international uniformity. Unless there are further questions, I'm happy to rest on my briefs. All right. Thank you. Thank you very much.
judges: Henderson; Katsas; Garcia